MAY, J., and BRADFORD, J., concur.

**Randall Thomas FORD, Appellant,**

v.

**Debra Ann FORD, Appellee.**

**No. 07A01–1012–DR–601.**

Court of Appeals of Indiana.

Aug. 17, 2011.

Michael A. Ksenak, Martinsville, IN, Attorney for Appellant.

## OPINION

MATHIAS, Judge.

Randall Thomas Ford ("Randall") challenges the Brown Circuit Court's order determining that funds in Randall's employer-funded health benefit account constitute a marital asset subject to equal division in the marital dissolution action filed by Debra Ann Ford ("Debra"). On appeal, Randall claims that his interest in the employer-funded account was not vested and was therefore not subject to division as a marital asset. We affirm the trial court's conclusion that the benefit plan constitutes a marital asset subject to division, but we reverse the trial court's judgment regarding valuation of the account.

### Statement of Facts

Randall and Debra were married in 1978. During the parties' marriage, Randall was a member of the Indiana/Kentucky Regional Council of Carpenters of the United Brotherhood of Carpenters and Joiners of America ("the Union"). As a member of the Union, Randall received certain benefits pursuant to collective bargaining agreements ("CBAs") entered into by the Union and various employers. Pursuant to the CBAs, employers are required to contribute to the Indiana/Kentucky Carpenters Welfare Fund ("the Fund"). Randall, as a Union member, was eligible to participate in the Fund, which is "maintained for the purpose of providing Medical, Prescription Drug, Dental, Vision, Hearing, Weekly Income, Life Insurance and Accidental Death and Dismemberment Insurance Benefits." Stipulated Exhibit 1, p. 67.

The nature of the benefits provided by the Fund to Union employees such as Randall is set forth in a document titled "Indiana/Kentucky Carpenters Welfare Fund Combination Plan Document and Summary Plan Description" ("the Plan"), which was admitted as a stipulated exhibit. In summary, employers contribute a certain amount into the Fund per employee based on the amount of hours the employee works. The contributions are placed in a Dollar Bank Account, which is defined as

"the individual account that Employers contribute on Employee's behalf for hours worked." Stipulated Exhibit 1, p. 73. The employer-provided contributions in the Dollar Bank Account are then "used to purchase eligibility under this Plan and to reimburse eligible medical expenses." *Id.*

One of the eligibility requirements under the Plan is that a threshold amount be in the employee's Dollar Bank Account. Once this threshold is met, the employee, the employee's spouse, and any dependents are eligible for benefits. "After a Participant initially qualifies, he will retain coverage for each succeeding calendar month that he is credited with the required contributions." *Id.* at 10. Contributions that are in excess of "an amount set by the Board of Trustees for any month" are "accumulated in the Participant's Dollar Bank Account to be used in future months when he may not be credited with sufficient contributions." *Id.* In addition, if there are enough funds in the employee's Dollar Bank Account, the employee may request to be reimbursed for certain out-of-pocket medical expenses:

> *Under the Medical Reimbursement Plan a Participant may request that his deductible, Co–Payment, and certain other expenses not covered by this Plan be reimbursed to him up to four times per Calendar Year, using the money he has accumulated in his individual Dollar Bank Account.* Charges will only be considered for reimbursement after they are processed under the Plan. The Fund Office will not reimburse Participants for claims not processed unless they are for non-covered charges. Not all non-covered charges under the Medical Plan may be covered under the Medical Reimbursement Plan, due to federal regulations. In addition, the Participant must pay the medical bill or other expense and submit proof of payment . . .

before the request for reimbursement will be processed.

> The Participant's Dollar Bank Account will be reduced by the amount of his reimbursement, and his account will be charged a $5 administration fee for issuing the medical reimbursement check. . . .
>
> **In no event will reimbursement be allowed to reduce the balance in [the Participant's] Dollar Bank Account to an amount equal to less than three months of eligibility.**

*Id.* at 24 (emphasis added, bold in original).

If, after initially meeting the eligibility requirements, a Union employee fails to be credited with the required employer contributions, and does not have sufficient funds in his Dollar Bank Account, the employee may retain eligibility by making payments himself "in an amount equal to the difference between the Employer contributions credited on his behalf and the total amount required for eligibility." *Id.* at 13. Similarly, retired employees may continue to purchase benefits by making payments themselves, either directly or from the amount accumulated in the retired employee's Dollar Bank Account.

An employee's Dollar Bank Account is "frozen" if he "becomes employed by a city, county, state government, or International Union in a job classification normally covered by a[CBA]." *Id.* at 14. If the employee returns to active work, the account is unfrozen. The Plan also describes conditions under which the employee's eligibility terminates:

> Notwithstanding any of the above language pertaining to continuing eligibility through self-payment, if a Participant is terminated from his employment with a contributing Employer, either voluntarily or otherwise, and accepts employment in the same industry with a noncontri-

buting employer, his right to continuing eligibility using his Dollar Bank Account is terminated at the end of any coverage period during which these events take place. *Any credit in his Dollar Bank Account will be reduced to zero.*

At such time a Participant will be able to continue eligibility only by making self-payments pursuant to the rules described in Section 2.15—COBRA Continuation Coverage.

If a Participant stops working for a contributing Employer but continues to work under the terms of a[CBA] of another affiliated Union of the United Brotherhood of Carpenters and Joiners of America, he will be covered so long as his Dollar Bank Account is sufficient to continue eligibility . . . .

*Id.* at 14 (emphasis added). Once an employee becomes ineligible for benefits, he must again meet the rules of initial eligibility to regain coverage.

The introduction to the Plan informs employees that "The Trustees strive to maintain and improve the benefits available to you and your Eligible Dependents. However, the Trustees do reserve the right to amend the Plan in any way they feel necessary or desirable." *Id.* at 1. The Plan also explains that "The Board of Trustees, as Plan Administrator, has full authority to increase, reduce or eliminate benefits and to change the Eligibility Rules or other provisions of the Plan at any time." *Id.* at 2. Furthermore, the Plan states that:

*The Trustees may amend or terminate any coverage in force under this Plan at any time, without consent of any person, by written notice.*

This Plan shall continue in effect until amendment or termination by the Trustees pursuant to the terms of this Section

\* \* \*

Upon termination of · the Plan as respects any Employer, the coverage of that Employer's Participants and of Totally Disabled Participants, Retirees and covered Dependents shall thereafter be null and void.

\* \* \*

The Plan will have no liability for Expenses Incurred after the day the Plan or the Eligible Participant's coverage terminates.

*Id.* at 55–56 (emphasis added). Another section of the Plan provides:

*The Board of Trustees reserves the right to change, suspend or end the plan at any time and for any reason, in whole or in part.* In addition, benefits may be discontinued at any time for any group of participants (including inactive participants or retirees). This document is not a promise always to provide any particular benefit. *In general, if a plan is ended you will not be vested in any plan benefits or have any rights.* In the event that the plan is discontinued or terminated, in whole or in part, benefits will be paid only for services received up to the date of plan termination. However, the amount and form of any final benefit you may receive will depend on plan assets, any contract or insurance provisions affecting the plan and decisions made by the Board of Trustees. You will be notified if the plan is amended.

*Id.* at 67 (emphasis added).

The Plan also contains a provision limiting the obligations of the Plan:

Notwithstanding anything herein to the contrary, the liability for financing the benefits under the Plan is limited to such contributions as may be made by the Employers (or self-payments by the Employee) pursuant to the [CBAs]. If

there are not sufficient assets in the Fund to provide the benefits otherwise payable under this Plan, then such benefits shall not be payable under the Plan and neither the Plan Administrator nor Trustees shall be liable for such benefits.

*Id.* at 57.

### Procedural History

Debra filed a petition for dissolution of marriage on March 12, 2010. During the dissolution proceedings, the parties reached a mediated settlement agreement. This agreement provided, with regard to the benefits:

The parties agree that the sum of $28,694.31 was the amount of employer contributions in the Indiana/Kentucky Carpenters Union Fringe Benefit Fund as of March, 2010. The parties do not agree whether this sum is a vested, divisible marital asset and reserve this issue for determination of the Court at the already scheduled final hearing in this matter.

Appellant's App. p. 15. The trial court held a hearing on this matter on October 18, 2010, at which Debra argued that Randall had a vested right in the Fund. The trial court agreed, and entered an order on October 25, 2010, stating in relevant part:

2. The parties were able to reach an agreement in this cause with respect to all issues except whether [Randall]'s Dollar Bank Account constitutes a divisible marital asset. The account is part of [Randall]'s union employment and medical benefit package under the Indiana/Kentucky Carpenters Welfare Fund. The account consists of employer contributions which can be used solely for healthcare related expenses. All employer contributions were contributed during the parties' marriage. [Randall] enjoys a present possessory interest in the account.

3. In general, [Randall] does not forfeit his right to the account upon termination of employment. However, there are certain contingencies under which [Randall] would forfeit his right to the value of the account, including acceptance of future employment with certain competitors or termination of the plan by the board of trustees of the fund. Nevertheless, these contingencies do not [a]ffect his present possessory interest in and right to the account. As such, it is a divisible marital asset.

4. While the contingencies [a]ffecting [Randall]'s future right to the account and the restrictions on use of the account might [a]ffect evaluation of the asset, here the parties have agreed that the account is worth $28,694.31. The Court accepts the parties' value. Having considered the terms of the parties' Mediated Settlement Agreement and the argument of counsel at the hearing, the Court finds that the asset should be divided equally between the parties.

5. With the issue of whether the Dollar Bank Account constitutes a divisible marital asset now answered by the Court, the parties are given thirty days from the date of this order to reach an agreement as to how to effect the Court's 50/50 division of the account. If they cannot reach such an agreement, the Court will issue a further order after thirty days or sooner if the parties notify the Court of an absence of an agreement.

Appellant's App. pp. 9–10. Randall now appeals.

### Standard of Review

On appeal, we review the trial court's valuation of marital assets for an abuse of discretion. *Bingley v. Bingley,*

935 N.E.2d 152, 154 (Ind.2010) (citing *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996)). With respect to the trial court's findings of fact about an asset's value, a trial court has not abused its discretion if sufficient evidence and reasonable inferences support that valuation. *Id.* "Questions of law, however, are subject to *de novo* review." *Id.* (citing *Fobar v. Vonderahe,* 771 N.E.2d 57 (Ind.2002)).

We further note that Debra has not filed a brief with this court. When an appellee fails to submit a brief, an appellant may prevail by making a *prima facie* case of error. *Mikel v. Johnston,* 907 N.E.2d 547, 550 n. 3 (Ind.Ct.App.2009). This rule protects this court and takes from us the burden of controverting arguments advanced for reversal, a duty which remains with the appellee. *Id.* Still, we are obligated to correctly apply the law to the facts in the record in order to determine whether reversal is required. *Id.*

## I. Vesting

On appeal, Randall claims that the trial court erred in concluding that the Dollar Bank Account was a marital asset. As explained by our supreme court in *Bingley,* whether a right to a present or future benefit constitutes an asset that should be included in marital property depends mainly on whether it has "vested" by the time of dissolution. 935 N.E.2d at 155. That is, "vesting is both a necessary and sufficient condition for a right to a benefit to constitute an asset." *Id.* (citing *Hill v. Hill,* 863 N.E.2d 456, 460–61 (Ind. Ct.App.2007) (pension plan was a marital asset because the party was receiving payments at time of dissolution); *Bizik v. Bizik,* 753 N.E.2d 762, 767–68 (Ind.Ct.App. 2001) (retirement plan was not a marital asset because it had not vested at the time of dissolution)). There are two ways in which a right to a benefit can vest: (1) vesting in possession or (2) vesting in interest. *Id.* at 156. "'Vesting in possession connotes an immediate[ly] existing right of present enjoyment.'" *Id.* (quoting *In re Marriage of Preston,* 704 N.E.2d 1093, 1097 (Ind.Ct.App.1999)). Whereas "'vesting in interest implies a presently fixed right to future enjoyment.'" *Id.* (quoting *Preston,* 704 N.E.2d at 1097).

Randall claims on appeal that his Dollar Bank Account is not vested for various reasons. Specifically, Randall notes that, pursuant to the Plan, the money in the Account can be frozen if he goes to work for a governmental employer, or can be reduced to zero if he goes to work for an employer not governed by a CBA. Moreover, the Plan states that benefits can be changed, suspended, or eliminated "at any time and for any reason, in whole or in part." Stipulated Exh. 1, p. 67. The Plan even specifically states that "[*i* ]*n general, if a plan is ended you will not be vested in any plan benefits or have any rights.*" *Id.* (emphasis added). For these reasons, we agree that Randall is not vested in interest, i.e., he has no presently-fixed right to a future enjoyment, as his benefits under the Plan are subject to reduction, freezing, or even elimination. But this does not end our discussion, as the trial court concluded that Randall was vested in possession. *See* Appellant's App. p. 10 (concluding that Randall had "present possessory interest" in the Account).

Randall claims that his interest in the Dollar Bank Account cannot be vested because it is defeasible, citing *Bingley.* In that case, the husband's employer, as part of a pension plan, made monthly payments to a health insurance company on behalf of the husband and "promised to do so for the remainder of [his] life." 935 N.E.2d at 154. The husband had no choice to receive these benefits in lieu of a larger monthly stipend and "his right to health insurance

benefits was not subject to divestiture, division, or transfer." *Id.*

On transfer, our supreme court held that the husband's health insurance benefits were vested and were therefore a divisible marital asset. *Id.* at 156. The court noted that the husband had a right to the insurance coverage for the rest of his life and that his employer had assumed the liability that would have otherwise been his to bear. *Id.* Thus, the husband had a "present right to enjoy his health insurance benefits," and it was undisputed that these benefits "were not subject to divestiture in future years." *Id.*

In so holding, the court contrasted this situation with employer-provided term life insurance, where the beneficiary has a defeasible interest in the policy until after the insured's death. *Id.* Specifically, the court cited *Metropolitan Life Insurance. Co. v. Tallent*, 445 N.E.2d 990 (Ind.1983). In *Tallent*, the husband changed the beneficiary on his life insurance policy from his wife to his mother after his wife filed to dissolve their marriage and just before he committed suicide. *Id.* at 991. At the time he changed the beneficiary on his policy, the husband was subject to an order restraining him from disposing of his property. *Id.* On appeal, the *Tallent* court held the life insurance policy was not one of the husband's assets subject to the restraining order. *Id.* In so holding, the court noted that the beneficiary's interest in the policy was defeasible and a "mere expectancy" until after husband's death. *Id.* at 992.

Randall reads these cases to mean that so long as an interest is defeasible, it can never be vested. To be sure, the health insurance benefits at issue in *Bingley* were not defeasible. *See* 935 N.E.2d at 156. And the term life insurance policy at issue in *Tallent* was wholly defeasible and a mere expectancy. *See Tallent*, 445 N.E.2d at 992. Here, however, the Dollar Bank Account is not guaranteed for life, but neither is it a mere expectancy.

Not only can Randall presently use the funds in the Account to purchase his benefits, but, under certain conditions, he can even receive reimbursement for out-of-pocket expenses such as deductibles, co-payments, and some other medical expenses. This is entirely different from the term life insurance policy at issue in *Tallent*, where the beneficiary had merely an expectancy in the policy until after the death of the insured. Randall has an immediately-existing right of present enjoyment with regard to the Dollar Bank Account, and is therefore vested in possession with regard thereto. Because Randall is vested in possession with regard to the Account, the trial court properly concluded that the Account is a divisible marital asset.

We recognize that Randall's future right to benefits is not guaranteed and that there are certain contingencies that might impact Randall's Dollar Bank Account in the future. For example, the Trustees might reduce or eliminate benefits, the account will be frozen if Randall accepts employment with a governmental entity, and the account will be eliminated if his employment is terminated and he accepts employment with an employer not covered by a CBA. Although these possibilities might impact the valuation of the account, they do not alter the fact that that Randall does have an immediately-existing right to present enjoyment of the Account. *See Bingley*, 935 N.E.2d at 156–57 (illiquidity of husband's account was relevant to valuation of marital asset but not whether it constituted a marital asset). In short, the trial court properly concluded that the Dollar Bank Account was a marital asset subject to division in the dissolution proceedings.

## II. Valuation

Randall also argues that, even if the trial court was correct in determining that his interest in the Dollar Bank Account was vested, the trial court erred with regard to valuation of the account. The trial court concluded that the parties "agreed that the account is worth $28,694.31." Appellant's App. p. 10. However, our review of the record reveals that the parties agreed only that "the sum of $28,694.31 was the amount of employer contributions in the [Dollar Bank Account] as of March 2010." *Id.* at 15. This is not the same as agreeing that the value of the Account as a marital asset was $28,694.31. As noted above, there are various contingencies that might affect Randall's future enjoyment of the Dollar Bank Account. Thus, the Account might well be valued at substantially less than $28,694.31. *See Bingley,* 935 N.E.2d at 156–57 (noting that illiquidity of husband's pension fund was relevant to the value the trial court might assign to the asset).

Here, the trial court concluded that the parties agreed as to the value of the Account. Because the record reflects that the parties agreed only as to amount of employer contributions in the Dollar Bank Account, we remand this case to the trial court with instructions to conduct a hearing at which the value of the Account as a divisible marital asset may be determined. *See id.* at 157–58 (noting the various means of valuing health insurance benefits).

Affirmed in part, reversed in part, and remanded.

KIRSCH, J., and VAIDIK, J., concur.